HeRbeet, J.
We consider first the issue on which the Court of Appeals certified this cause.
The defendant has maintained throughout that the trial court should have charged the jury that, “unless they find that plaintiff’s loss of vision is at least 25 per cent, the jury will find for the defendant,” and contends that failure to do so constitutes reversible error.
As applicable to this case, Section 1465-80, General Code (Section 4123.57, Eevised Code), provides in part:
“Partial disability compensation shall be paid as follows:
*480 i 6 * # *
“ (b) In all cases included in the schedule in paragraph (c) hereof, and in all cases in which the employee has elected or is deemed to have elected that compensation on account of partial disability shall be awarded under the provisions of paragraph (b) hereof, and in all cases where the Industrial Commission has determined that the percentage of physical disability is less than 25 per cent, the injury shall be deemed to have resulted in permanent partial disability. * * *
“(c) In cases included in the following schedule the compensation payable to the employee shall be 66 2/3 per cent of the average weekly wage, not to exceed a maximum of 32 dollars and 20 cents per week and not to be less than a minimum of 14 dollars per week, and shall continue during the periods provided in the following schedule, to wit:
( i # * tt
“For the permanent partial loss of sight of an eye, 66 2/3 per cent of the average weekly wages for such portion of 125 weeks as the commission may, in each case determine, based upon the percentage of vision actually lost as a result of the casualty, but in no case shall an award of compensation be made for less than 25 per cent loss of vision. In no case shall the payments of compensation for partial loss of sight or total loss of sight or facial or head disfigurement due to loss of the eye, whether caused by one or more accidents total more than 125 weeks.” (Emphasis added.)
In conjunction with the above section, also to be considered is Section 1465-89, General Code (Section 4123.66, Revised Code), which provides:
“In addition to the compensation provided for herein, the Industrial Commission of Ohio shall disburse and pay from the State Insurance Fund, such amounts for medical, nurse and hospital services and medicine as it may deem proper * *
Section 1465-90, General Code (Section 4123.51, Revised Code), so far as pertinent, provides:
“The commission shall have full power and authority to hear and determine all questions within its jurisdiction, and its decisions thereon shall be final, except as provided in this section. The commission shall definitely and specifically pass upon *481 each and every issue raised in the claim, necessary for a proper and complete decision thereon. In all claims for compensation on account of injury, or death resulting therefrom, if the commission denies the right of the claimant to receive compensation or to continue to receive compensation the order of the commission shall state the ground or grounds on which the claim was denied; and if the claim was denied on any of the following grounds: * * * that the claimant’s disability is not the result of the injury * * * then the claimant may within 30 days after the receipt of notice of such finding of the commission, file an application with the commission for a rehearing of his claim * * *.
“If the commission, after such hearing, denies the right of the claimant to receive or to continue to receive compensation it shall state the ground or grounds on which the claim was denied and if the claim was denied on any of the grounds here-inabove specifically stated then the claimant, within 60 days after receipt of notice of such action of the commission, may file a petition in the Common Pleas Court of the county wherein the injury was inflicted * * V’
From the facts recited in the statement preceding this opinion, it is clearly apparent that the Industrial Commission disallowed the claim on the ground that plaintiff’s disability was not the result of the injury and for no other reason. The transcript of the record made upon rehearing discloses no medical testimony relating to the percentage of plaintiff’s disability.
In the WMtlatch case, supra (see, also, Industrial Commission v. Whitlatch, 21 Ohio Law Abs., 34, same case on rehearing —motion to certify record overruled January 29, 1936), the Court of Appeals for Franklin County held that “before a claimant is entitled to an allowance of compensation for a permanent partial loss of vision he must establish that he has suffered at least a 25 per cent loss, and until such a percentage of loss is shown he is not entitled to recover,” citing State, ex rel. Schindler, v. Industrial Commission (1932), 126 Ohio St., 34, 183 N. E., 871. The court stated further that “it is our view that until such a percentage of loss was sustained and shown, the claimant would not be entitled to share or participate in the compensation fund for a permanent partial injury.”
*482 It appears in the opinion in that ease after rehearing (cited above) that the order of the Industrial Commission, from which appeal was taken, was that “ ‘it has no jurisdiction of the claim and no authority thereby to inquire into the extent of disability or amount of compensation claim.’ ” It is not clear whether the commission disclaimed jurisdiction solely because of the failure to establish a 25 per cent loss of vision or for some other reason. However, that case furnished the authority for the Court of Appeals for Lorain County to render its judgment in the Bacetti case, supra. In that case, the trial court gave a special request before argument and charged the jury in substance that the plaintiff must prove by a preponderance of the evidence that his loss of vision was at least 25 per cent. That ■court followed the ruling of the Whitlatch case. We can find no other cases, however, which support that view.
In the case of State, ex rel. Kauffman, v. Industrial Commission (1929), 121 Ohio St., 472, 169 N. E., 572, the relator asserted that he had previously filed a claim for compensation for injuries suffered in the course of his employment, which claim had been allowed and compensation paid thereunder until a certain time. Upon the denial of further compensation, an appeal was taken to the Court of Common Pleas, and the jury returned a verdict finding plaintiff entitled to participate in the fund. The judgment of the court having been certified to the Industrial Commission, further compensation was paid for a time, when it was again denied upon a finding that the proof was not sufficient to show that the relator was suffering disability as a result of the injury. Following that order, the relator filed his petition in mandamus in this court. Paragraphs one and two of the syllabus in that case read:
“1. By virtue of Section 1465-90, General Code, in cases heard on appeal to a Common Pleas Court from the Industrial Commission, the jury may only find whether or not the claimant is entitled to participate in the workmen’s compensation fund, and the court may only pronounce judgment whether the claimant is entitled to participate in the workmen’s compensation fund and to be paid in the manner provided by the workmen’s compensation law.
“ 2. A verdict and judgment so entered and certified to the *483 Industrial Commission do not impose upon the Industrial Commission a duty to pay compensation to any particular future date or for any particular extent of disability; it becomes the duty of the commission upon receiving such certificate to recognize the verdict and judgment as awarding some disability and to proceed to inquire the extent of such disability.”
In tbe body of the opinion, Marshall, C. J., stated:
“The policy of the law is expressed in Section 1465-90, General Code, and states with particularity what may be heard by the Court of Common Pleas and what the verdict of the jury may award. It also provides with equal particularity as to what the judgment of the court may order. The verdict and the judgment in this case conform to the statute. By the verdict and judgment it becames conclusive upon the commission that Kauffman was entitled to some compensation further than that which had already been awarded to him by the commission. The extent of the further disability and the extent of the further compensation could only be ascertained by the commission.”
In the case of Fisher Body Co. v. Cheflo (1930), 122 Ohio St., 142, 171 N. E., 31, paragraph one of the syllabus reads:
“When the Industrial Commission has found that it has no jurisdiction of an applicant’s claim and no authority to inquire into the extent of his disability or amount of compensation, and the applicant has filed, under favor of Section 1465-90, General Code, a petition to review such finding, neither the trial court nor the jury has authority to determine the extent of applicant’s disability or the amount of compensation which he should receive; the determination of those questions is confided to the commission. * * *”
That case approved and followed the Kauffman case, supra, and had been certified to this court by the Court of Appeals for Cuyahoga County as being in conflict with the case of Industrial Commission v. Pomeroy, 33 Ohio App., 80, 168 N. E., 572. In the opinion, Jones, J., stated:
“The Industrial Commission disallowed the applicant’s claim because the proof did not show that his injury was received in the course of employment. Plaintiff in error contends that neither the court nor jury had authority to fix the amount of compensation or to inquire into the extent of disability. Be *484 fore argument the defendant specially requested the court to charge the jury that if they determined the right of plaintiff to recover they should not determine what amount the plaintiff should receive as compensation, nor for what period he should receive it. The court refused to give the special request, and charged the jury that, if they found for the plaintiff, it was within their discretion to determine for what number of weeks it allowed compensation, limited to two-thirds of his earning capacity, but not exceeding $18.75 per week. The question, therefore, succinctly stated, is this: Was it within the province of the court or jury if they found in favor of the plaintiff, to determine the extent of disability or the amount of compensation which the applicant should receive? The lower courts answered that question in the affirmative. No doubt they would have done otherwise had they known of a later decision of this court upon this subject, reported in a case styled State, ex rel. Kauffman, v. Industrial Commission, 121 Ohio St., 472, 169 N. E., 572. In that case we held unanimously that, under the construction given to Section 1465-90, General Code, the jury is only authorized to find whether the claimant was entitled to participate in the fund; that this was the extent of its authority; and that neither court nor jury had power to determine the amount of compensation. In such cases the procedure provided in Section 1465-90, General Code, is clear and definite. The statute states that, ‘if the finding of the court or the verdict of the jury is in favor of the claimant’s right to participate * * * the court shall certify such finding or verdict to the Industrial Commission and the commission shall thereupon order compensation to be paid in the manner provided by this act for the payment of other awards, etc.’ ”
Those two cases have been followed consistently ever since. The case of State, ex rel. Schindler, v. Industrial Commission (1932), 126 Ohio St., 34, 183 N. E., 871, must be considered in connection with the Kauffman case. That also was an action in mandamus. Marshall, C. J., in the opinion in that case, stated:
“The relator * * * was injured while employed at the plant of the Sugarcreek Clay Products Company. The injury was to his eye, resulting from a chip of glaze from the bricks *485 lie was handling flying into his right eye, shortly thereafter resulting in entire loss of vision in his right eye. Compensation having been denied by the Industrial Commission, claimant appealed to the Court of Common Pleas of Tuscarawas County. The verdict of the jury in that court found that claimant was entitled to participate in the workmen’s compensation fund, and that the injury complained of was the result of an injury sustained in the course of and arising out of his employment
‘ ‘ * * * The verdict of the jury in form only found the right of the claimant to participate in the fund, and further found the jurisdictional fact that the injury was the result of an injury sustained in the course of and arising out of the employment.
“The petition in this court further alleges that, when the judgment of the Common Pleas Court was certified to the commission, it ordered medical expenses to he paid, and ordered that the claimant file medical proof of temporary total disability, if any, due to his injury. Relator claims that he is entitled to compensation, not merely for temporary total disability, but that he is entitled to be compensated for loss of member, as provided in the schedule to Section 1465-80, as follows: 'For the loss of an eye, 66 2/3 per cent of the average weekly wages during 100 weeks. ’
“The Industrial Commission has demurred to the petition, and for the purposes of the demurrer admits the well pleaded allegations of the petition. * * *
“The commission relies upon the case of State, ex rel Kaufman, v. Indus. Comm., 121 Ohio St., 472, 169 N. E., 572. Without reviewing the facts found and the law declared in that case, it is sufficient to say that the judgment of this court in that case was based upon its peculiar facts. The judgment was by the unanimous concurrence of all the members of the court, and no modification need be made in this case of the law applied to the facts of that case. The relator in that case had suffered injuries other than the loss of a member, and the sole inquiry was as to the period of time covered by his disability. * * *
Í ( * * #
“In the case at bar the situation is wholly different. The petition alleges, and the demurrer admits, that the injury *486 suffered by the claimant was the loss of a member. In cases of ordinary injury, where there is the probability, or even a possibility, of recovery, the commission has continuing jurisdiction to determine the extent of the injury and the amount to be awarded as compensation. By the terms of the schedule in Section 1465-80, covering loss of members, the commission has no discretion.”
Following that decision, which overruled the demurrer to the petition, the cause went back to the Industrial Commission and was again brought before this court by petition for writ of mandamus in State, ex rel. Schindler, v. Industrial Commission (1933), 127 Ohio St., 39, 186 N. E., 872, which writ was denied in the latter case because “it does not appear from the record that the respondent refuses to act under that order,” and “the answer of the respondent alleges that it is willing to pay compensation for loss of vision and has requested the relator to submit to examination so that it may be determined whether there is a total loss of vision to his injured eye; and that the relator refuses to submit himself to such examination.” The end result in the Schindler cases is therefore in conformity with the Kauffman case.
In the light of the facts in the instant case, it is interesting also to note the case of State, ex rel. Depalo, v. Industrial Commission (1934), 128 Ohio St., 410, 191 N. E., 691, the syllabus of which is as follows:
“1. The key to the interpretation of Section 1465-90, General Code, as to whether a claimant is entitled to an appeal, is found in the first sentence. The subsequent provisions of the section must be construed in the light of the expressed intention of the Legislature to give the Industrial Commission exclusive authority to determine all questions within its jurisdiction.
“2. A denial by the commission of the right of the claimant to continue to receive compensation does not in itself involve a jurisdictional fact, but, in order to entitle the claimant to a rehearing and appeal, it must appear that the commission’s denial was based upon a finding that it had no jurisdiction of the claim and no authority to inquire into the extent of disability or the amount of compensation. There is no presumption that a finding of the commission denying the right to con- *487 túrne to receive compensation is based upon jurisdictional grounds. (State, ex rel. Araca, v. Industrial Commission, 125 Ohio St., 426, and Perkins v. Industrial Commission, 106 Ohio St., 233, modified. State, ex rel. Ceskovsky, v. Industrial Commission, 126 Ohio St., 434, approved and followed.)
“3. A finding of the commission within its jurisdiction, such as determination of the extent of disability or amount of award, is a final decision from which there is no appeal. And a finding of the commission denying the right of the claimant to receive compensation, or to continue to receive compensation, because the commission has no jurisdiction of the claim and no authority to inquire into the extent of disability or the amount of compensation, is an appealable decision.”
The cases of Noggle v. Industrial Commission (1935), 129 Ohio St., 495, 196 N. E., 377, and State, ex rel. Hess, v. Industrial Commission (1938), 133 Ohio St., 599, 15 N. E. (2d), 528, also reaffirm the exclusive jurisdiction of the Industrial Commission to determine the extent of disability.
Here, the only issue before the jury was that of jurisdiction based on whether the disability was a result of the injury of May 25, 1946. It was the only issue dealt with in the record made on rehearing before the referee, was the allegation of ultimate fact in plaintiff’s petition and is denied in defendant’s answer. The jury verdict simply found in favor of plaintiff on that point.
Once the causal connection between the disability and injury has been established, however, the provisions of subdivision (b) of Section 1465-80, General Code, quoted above, certainly extend to the plaintiff the right to additional compensation authorized under Section 1465-89, General Code, regardless of the per cent of disability. In short, it could very well develop in a case of this type that, upon final determination of the causal relationship between the injury and the disability, the commission might find, after certification, that there was less than 25 per cent loss of vision incurred, thus preventing payments under the quoted subdivision of Section 1465-80, General Code, but the commission would still have jurisdiction to pay additional compensation for medical and hospital services under Section 1465-89.
*488 Those rulings quoted and cited above have prevailed over a long period of years during which the General Assembly has not substantially changed the provisions of Section 1465-90, fixing jurisdiction.
We conclude, therefore, that it was not error for the trial court to refuse defendant’s request to charge the jury that, unless it finds plaintiff’s loss of vision to be at least 25 per cent, it must find for the defendant, and that the Court of Appeals was correct in affirming the judgment of the trial court in this respect.
It is established that certification of a cause to this court because of conflict between judgments of Courts of Appeals brings the entire cause up for review. Pettibone v. McKinnon, 125 Ohio St., 605, 183 N. E., 786, and Couk v. Ocean Accident & Guarantee Corp., Ltd., 138 Ohio St., 110, 33 N. E. (2d), 9.
The other issues presented for review are encompassed by defendant’s contentions that there is no competent probative evidence to support plaintiff’s case, that there was inference based on inference, and that the verdict of the jury was based on speculation and conjecture.
The record here shows the testimony of four witnesses — the plaintiff, Dr. Schrimpf, Dr. Goldblatt, and Dr. Brumm.
The plaintiff testified that after his discharge from the hospital he went back to work in July 1946 following a two-week vacation for which he was paid, and he could not recall any further trouble with his eyes after that. He then stated that “it seemed like everything was all right but I believe that the injury there in 1946 had damaged something in my eyes and it attacked my weakest eye which has caused the blindness in my left eye.” He was asked and he answered:
“Q. # * * between 1946 when you got the fatty alcohol in your eye and November of 1950 when this soap got in your eye, what had been your condition as far as being able to see was concerned? A. Well, I would say my eyes did feel like they were tiring, that is, when I would read the paper I would notice I would either fall asleep reading and wouldn’t have to read very much that I would fall asleep. My eyes would tire.”
The case of Stacey v. Carnegie-Illinois Steel Corp. (1951), 156 Ohio St., 205, 101 N. E. (2d), 897, holds that, where the *489 question of a causal relationship between an accident and a claimed disability presents a question of scientific inquiry not within the usual knowledge of lay witnesses or of jurors, the testimony of lay witnesses is without probative value to establish the probability of proximate causal relationship, and medical testimony is essential in order to prove such relationship. The decision approved and followed the case of Drakulich v. Industrial Commission (1940), 137 Ohio St., S2, 27 N. E. (2d), 932. In the instant case, plaintiff’s testimony as to his glaucoma can be considered, therefore, only in accordance with this rule. Excerpts are quoted above only for the purpose of subsequent reference with the testimony of Dr. Schrimpf.
Dr. G-oldblatt is a dermatologist and treated the plaintiff only for dermatitis. His testimony on direct examination was concluded with the following question and answer:
“Q. And your treatment was directed only as to the skin condition, is that right, sir? A. That’s right.”
He was not cross-examined.
Dr. Brumm, who first saw the plaintiff on December 22, 1952, was called by defendant as an ophthalmologist. He defined glaucoma and stated that “chronic simple glaucoma falls under a primary type of glaucoma” and that “this man’s glaucoma very definitely falls into the primary type. ’ ’ When asked on cross-examination what is the cause of glaucoma, Dr. Brumm’s answer was: “As I initially stated, the cause of primary glaucoma is not known * *
It is elementary that, in determining a motion for a directed verdict, only that evidence most favorable to the party against whom the motion is made will be considered. Therefore, Dr. Brumm’s testimony is considered only so far as it confirmed that of Dr. Schrimpf.
It is apparent from the record that the plaintiff’s hospitalization in 1946 was primarily due to his dermatitis about which Dr. Goldblatt testified. Dr. Schrimpf stated that “we dismissed him on June the 23rd, 1946, as well, an uneventful recovery,” that “we checked his vision and everything else was normal,” and that “his vision in both eyes, each eye, right and left respectively, was 20/20 * * * that’s normal.” He defined glau *490 coma as “an increase over the normal, an increase in tension over the normal,” stated that “normal tension is around 20 to 25 and [on December 9, 1950] he had 50 and 58, right and left eye respectively,” and testified that “nobody knows exactly what the cause of glaucoma comes from.” So from there on we enter the field of conjecture and inference. Probabilities are set forth, some of which should be more properly called possibilities. Dr. Schrimpf testified further:
“The hypothesis here is that if he had a reaction back in 1946 that responded in a way or presented a dermatitis along with the keratoconjunctivitis, then of course we felt that it was probably due to something that he was working with. Upon that assumption we worked along the lines of trying to find out which of the products that he worked with might be the fault or might have precipitated the glaucoma. The fact that he had worked many years in and around these chemicals made me feel that it was probably something in his body chemistry perhaps at a certain time, that when he was at a low ebb and he came in contact with this stuff, whatever chemicals it was, that precipitated the glaucoma. We tested him * * *. Well, my opinion, my own personal opinion was that after a second bout of this eye condition in the form of glaucoma, that is, the second time he comes up with glaucoma, then my opinion was that it was probably due to something he was working with. I might state this. There is a probability that the second, that is, the glaucoma, was influenced by the severity of the first injury. There is a probability that this glaucoma may have existed for a long time even before we saw him, because glaucoma is like a thief in the night. It comes on an individual and they don’t even know it. So he was really in bad shape with the first injury. His eyes were closed and he was puffed up. He was really in bad shape. Now, it is probable that the glaucoma followed along that line, though we didn’t notice it. We didn’t test bim for it. We felt we had no reason for it. He responded to treatment and we signed him off.” (Emphasis added.)
It is also of interest to note his testimony as follows:
“Q. On May 25, 1946, Doctor, when Mr. Brecount saw you the first time, at the time of your initial examination was the left eye involved in any way? A. Not particularly. That did *491 not seem to be of mncb consequence at the time. It was marked in the right eye.
“Q. The subsequent inflammation and involvement of the left eye, was that entirely the result of the dermatitis? A. Yes. It was probably a spread of the dermatitis, the reaction.
“Q. At that time, after Mr. Breeount was discharged, did yon test his eyes, both eyes, for vision? A. Yes.
“Q. And was his vision normal? A. They were normal, yes; that is, considered normal, 20-20.
C t * * #
“Q. Now, Doctor, yon have indicated that yon thought that the glaucoma was due to something in connection with Mr. Bre-count’s work. Have you ever been able to assign definite causal connection between anything growing out of or pertaining to his work and this glaucoma, or is it just a feeling that you have although you have not been able to assign anything? A. We have not been able to definitely spot anything in his work. It’s just an assumption. We just presume that that’s the thing that he is working with. We skin tested him for all the materials that were brought in that he comes in contact with out there and we have not been able to find whether he comes in contact with other things or whether the materials, nine different kinds of chemicals that he is in contact with or that he is associated with — I guess contact would be the best word to use — we have not been able to find out which of these nine we have skin tested him, and he didn’t get any reaction from any of these. If we could have pinned it down to a specific chemical, then I could say, well, this is it, but we just presume that it’s a reaction from something out there and the only thing that I can also assume is that there are times when his own body chemistry isn’t up to par and this stuff, well, he reacts to it.
C i # * #
“Q. Are you able to say definitely that there is a causal relationship between these two injuries in May of ’46 and November of 1950 and his glaucoma? A. Well, I just presume that there is a connection.
“Q. You presume that that’s so but you have never been able to establish a definite causal connection? A. That’s right.
*492 “Q. Do you. have any idea how long Mr. Brecount had glaucoma at the time of the operation on his left or right eye? A. I don’t know how long he had it. You would have to ash him how long he had been disturbed with it. We surmise that it had been going along for a time because his tension was way up to 50 and 58 respectively and that is a pretty good tension, but with miotics — those are medications to pull the pupil down- — we were able to pull it down to 35 and we couldn’t pull it any lower than that. We got the right eye down to 29.
“Q. You said you presumed that it had been going on for some time because of the high tension. What length of time do you mean by that? Five years? Ten years? A. No, no.
“Q. Fifteen years? A. No, we would have evidently noticed the glaucoma if it were very evident in 1946 when I saw him in 1946.” (Emphasis added.)
These excerpts are set forth at length to show clearly how the jury, after the flat statement by Dr. Schrimpf that nobody knows exactly what causes glaucoma, was left to conjecture from the series of presumptions, inferences and “probabilities” what caused plaintiff’s disability.
Plaintiff contends that these are parallel inferences coming under the rule stated in paragraph two of the syllabus of Hurt v. Charles J. Rogers Transportation Co., 164 Ohio St., 329, 130 N. E. (2d), 820, whereas defendant contends that the controlling rule here is expressed in Sobolovitz v. Rubric Oil Co. (1923), 107 Ohio St., 204, 140 N. E., 634, and in Hoppe v. Industrial Commission (1940), 137 Ohio St., 367, 30 N. E. (2d), 703, which hold that an inference of fact may not be predicated on another inference.
The only established facts are that plaintiff had the accident in May 1946 with apparently complete recovery, and in December 1950 he had glaucoma in both eyes. As to the period preceding December 1950, the medical testimony was founded only on presumptions and inferences. Dr. Schrimpf first assumed that plaintiff had developed glaucoma over some period of time but did not fix the period within any given bracket nor did he establish a minimum period in which it could have developed, as did Dr. Brumm. He next assumed that the glaucoma “was influenced by the severity of the first injury.” Al *493 though his over-all testimony appeared to be quite conscientious, he indulged in a whole series of probabilities in his above-quoted answers to the hypothetical questions asked of him. Contradictorily, he testified relative to the increase in the tension within the eyeball that “as soon as it begins, it cuts off * # * the optic nerve fibers.” He then stated:
“At first it cuts off the peripheral fibers. The optic nerve is like a cable with thousands of fibers coming through and the eyeball, by virtue of its tension, squeezes down on that nerve and cuts off first the peripheral fibers and the last fibers that go are those in the center of the nerve, so like I mentioned before, it’s like a thief in the night. The individual doesn’t realize that he is losing his eyesight until suddenly it becomes gun barrel in vision. The central vision is all right but his peripheral vision keeps shutting off.” He then testified:
“Q. That could take place over quite some period of time, I suppose? A. That’s right.
“Q. You mentioned, Doctor, that Mr. Brecount might have had increased tension or the beginning or full-fledged glaucoma for a long time before you ever saw him? A. That’s right. That’s what made me feel that it was the first injury that had something to do with it, that it precipitated it.
“Q. But after the first injury, Doctor, was not his vision normal? A. As far as we tested him it was normal, as far as we went with his testing.
“Q. Were there tests that you could have made that you did not make, tests for glaucoma? A. That’s right.
“Q. No such tests were made? A. No. We didn’t feel it was necessary. That is, I tested him with my fingers and his eyes felt all right but that’s not a qualitative test.”
Factually, he testified that at the time he was treating the plaintiff for the eye injury of May 25, 1946, he did not consider it necessary to test him for glaucoma, but by his conjectures and by probabilities he drew from the inference that the plaintiff must have had glaucoma for some unspecified time prior to December 1950 the further inference that it was influenced by the severity of the injury of May 1946.
Without reviewing these and other inferences further, it should be apparent that they come under the rule declared in *494 the first rather than the second paragraph of the syllabns in Hurt v. Rogers, supra. We find no parallel inferences, although some might be termed alternative.
Although the facts in the case of Gerick v. Republic Steel Corp. (1950), 153 Ohio St., 463, 92 N. E. (2d), 393, are not comparable, paragraph three of the syllabus therein is pertinent and reads: “Evidence which shows simply that an injury either may have been the result of an accident in the course of and arising out of employment or may have been suffered in the course of employment in the regular course of nature in the usual and normal activities of the employment is not evidence to support a workmen’s compensation claim.” See, also, paragraph six of the syllabus in the case of Landon v. Lee Motors, Inc. (1954), 161 Ohio St., 82, 118 N. E. (2d), 147; paragraph three of the syllabus in the case of Stevens v. Industrial Commission (1945), 145 Ohio St., 198, 61 N. E. (2d), 198; and paragraph four of the syllabus in the case of Burens v. Industrial Commission (1955), 162 Ohio St., 549, 124 N. E. (2d), 724.
In its final analysis, plaintiff’s case rests on “probabilities” drawn from plaintiff’s medical testimony. These accumulate on top of each other and clearly should follow the inference upon inference rule. We, therefore, conclude that the trial court should have directed a verdict for defendant, and the Court of Appeals erred in affirming the judgment of the Court of Common Pleas.
The judgment of the Court of Appeals is reversed, and final judgment is rendered for defendant.

Judgment reversed.

Stewabt, Bell and Matthias, JJ., concur.
ZimmermaN, J., concurs in paragraphs one and two of the syllabus and in the judgment.
WeygaNdt, C. J., and Taft, J., concur in paragraph three of the syllabus and in the judgment.